PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

THE DANIELS COMPANY,
INCORPORATED,

*Petitioner,*

v.

FREDA MITCHELL, Surviving spouse
of James Mitchell; DIRECTOR,
OFFICE OF WORKERS' COMPENSATION
PROGRAMS,

*Respondents.*

No. 06-1137

On Petition for Review of an Order of
the Benefits Review Board.
(05-0132-BLA)

Argued: November 29, 2006

Decided: March 15, 2007

Before WILKINS, Chief Judge, and TRAXLER
and GREGORY, Circuit Judges.

---

Reversed in part, vacated in part, and remanded by published opinion.
Judge Traxler wrote the opinion, in which Chief Judge Wilkins and
Judge Gregory joined.

---

## COUNSEL

**ARGUED:** Kathy Lynn Snyder, JACKSON KELLY, P.L.L.C., Mor-
gantown, West Virginia, for Petitioner. Joseph E. Wolfe, WOLFE,

WILLIAMS & RUTHERFORD, Norton, Virginia; Rita A. Roppolo, UNITED STATES DEPARTMENT OF LABOR, Office of the Solicitor, Washington, D.C., for Respondents. **ON BRIEF:** Douglas A. Smoot, JACKSON KELLY, P.L.L.C., Morgantown, West Virginia, for Petitioner. Howard M. Radzely, Solicitor of Labor, Patricia M. Nece, Counsel for Appellate Litigation, UNITED STATES DEPARTMENT OF LABOR, Office of the Solicitor, Washington, D.C., for Respondent Director, Office of Workers' Compensation Programs.

---

## OPINION

TRAXLER, Circuit Judge:

In this claim for benefits under the Black Lung Benefits Act (the "Act"), 30 U.S.C.A. §§ 901-945 (West 1986 & Supp. 2006), Daniels Company, Inc. ("Daniels") seeks review of the Benefits Review Board's determinations that it is the coal mine operator responsible for any award of benefits to claimant James Mitchell ("Mitchell") and that Mitchell is entitled to benefits under the Act.[1] For the reasons that follow, we grant Daniels' petition for review, vacate the challenged decisions of the Board, and remand for further proceedings consistent with this opinion.

### I.

Mitchell worked for Daniels from September 1974 until February 1988, with the exception of a lay-off period from mid-January 1983 through November 1983. During this time, Daniels operated a fabricating shop in Bluefield, West Virginia, engaged in the business of building material-handling systems for various coal processing plants, including design, procurement, project management, construction, commissioning, and start-up of the systems. However, Daniels did not

---

[1]Just prior to issuance of the final Board decision below, the Board was notified that James Mitchell had died. His surviving spouse, Freda Mitchell, was substituted as the claimant/respondent under the Act and filed the petition for review to this court.

operate a coal mine or coal tipple,[2] or provide services or perform work at or near any such facility. All on-site construction related to its business was performed by subcontractors. In June 1978, Daniels Group, Inc., which owns Daniels, purchased Mesa Engineering ("Mesa"). Mesa provided maintenance and repair services on tipple machinery, but all work was performed when the mines and tipples were shut down.

Although Mitchell never worked at coal tipples in his capacity as a Daniels employee, Mitchell was at times offered the opportunity to work for Mesa maintaining and repairing equipment at the tipples. The work generally fell on weekends and holidays, providing Mitchell an opportunity to earn wages at time-and-a-half and double-time rates. In addition, Daniels was unionized under the United Steelworkers Union, whereas Mesa was governed by the United Mine Workers Union. Hence, Mitchell was paid a higher base "tipple-wage" rate of pay for his Mesa work. According to Daniels, Mesa "exist[ed] for the purpose of employing and paying Daniels Company's shop's employees on all jobs in which shop workers travel to and work at a client's work site." J.A. 407-08. It was necessary for Mesa to employ the workers so that they could be paid "the United Mine Workers' wage rate and be compatible with other UMW workers at the client's site." J.A. 414. In sum, it is clear that all work performed by Mitchell at the tipples was paid by Mesa and that Mitchell's exposure to coal dust was limited to the time that he performed such work as a Mesa employee.

The primary dispute in this case involves the amount of time that Mitchell worked at the coal tipples and, in particular, the method by which that time should be computed for the purpose of determining whether Mitchell is entitled to black lung benefits and whether Daniels can be held liable for such benefits under the Act. Mitchell contends that he should be credited under the regulations with twelve years of coal mine employment, which represents the entire time he worked for Daniels. Daniels contends that Mitchell should only be

---

[2]Generally, the coal tipple is the structure where the screening of the coal occurs and the final product is prepared for transport in the stream of commerce. *See Dir., OWCP v. Consolidation Coal Co.*, 923 F.2d 38, 42 (4th Cir. 1991).

credited with the time he *actually* worked at the coal tipples as a Mesa employee.

According to Mitchell's Social Security records, Mitchell first worked for Mesa in 1966 and 1967, a time frame which substantially predates his employment with Daniels and Daniels Group's acquisition of Mesa. It was, in any event, a brief and sporadic period of employment; Mitchell earned only $916.70 in the last two quarters of 1966 and $124.88 in the first quarter of 1967.[3] From 1967 through 1975, Mitchell earned no wages from Mesa, and the Social Security records and Mitchell's testimony confirm that he was employed exclusively in non-coal-related employment during this eight-year period.

Mitchell began working for Daniels in September 1974. During the years 1975 to 1978, which also pre-date Daniels Group's acquisition of Mesa, Mitchell was again paid a small amount of wages by Mesa, earning $117.00 in 1975, $49.92 in 1976, $352.08 in 1977, and $72.80 in 1978. Beginning in 1979, and coinciding with Daniels Group's purchase of Mesa, Mitchell earned the following wages from Mesa: $554.99 in 1979; $1461.17 in 1980; $1244.41 in 1981;

---

[3]Mitchell testified that he worked for Daniels at the tipples in 1966 and 1967. Daniels asserts that this was not possible because Mitchell did not work for Daniels until 1974 and Mesa was not in existence before 1978. This conflict was not discussed below, but is not significant as the amount of time involved would be too small to affect the outcome. In any event, the Social Security records document that Mitchell worked for HJD Company during all four quarters of 1966 and the first quarter of 1967 and that he did not begin employment with Daniels until the last quarter of 1974. There is, however, evidence that prior to Daniels Group's acquisition of Mesa in 1978, Peters Construction Company, which was also a signatory to the UMW labor contract and owned by Daniels Group, sometimes performed maintenance work at Daniels' customer sites. Peters Construction Company merged with Mesa in February 1979 and the name was changed to Mesa, which maintained the federal employee identification number of the former entity. Accordingly, Mitchell's testimony may not be inconsistent with Daniels' account. Mitchell could have performed a small amount of tipple work for Peters Construction in connection with a Daniels job.

$8085.15 in 1982; $3523.93 in 1983; $1691.28 in 1984; $244.08 in 1985; $240.48 in 1986; and $654.64 in 1987.

Employment records from Mesa were also introduced. Initially, they indicated that Mitchell had worked a total of 680 hours for Mesa while also an employee of Daniels. Additional records were later found that raised that figure to 832.5 hours. According to Daniels, Mitchell worked for Mesa for four days in 1979, eight days in 1980, five days in 1981, twenty-six days in 1982, eleven days in 1983, five days in 1984, one day in 1985, and one day in 1986. J.A. 409.

Mitchell's testimony was largely consistent with the documentary evidence. He was unable to estimate the percentage of time he worked at the tipples during his employment with Daniels, but confirmed that he was not "at coal mining sites on a regular bas[is] during [ ]his fourteen year period" of employment with Daniels. J.A. 193. He testified that he only worked at the tipples when work there was offered and that Mesa paid him for the work at tipple wages. He also confirmed that coal was not being processed during his work, but testified that coal dust present in the machines was often disturbed during the job.

In February 1988, Mitchell suffered an unrelated on-the-job injury when a hammer fell three stories and struck his head, ending his employment. Shortly thereafter, Mitchell began experiencing persistent fevers, fatigue and headaches. He underwent several hospitalizations and was diagnosed variously with meningitis, sarcoidosis, and possible tuberculosis. Although his skin test for tuberculosis was negative, medical evidence indicated that active tuberculosis could exist despite a negative reading. In June 1988, Mitchell was treated with anti-tuberculosis medications and responded favorably. He never returned to work at Daniels.

In January 1997, nearly nine years later, Mitchell filed a claim for black lung benefits under the Act. Mitchell alleged that he had worked for Daniels from September 1974 to February 1988, in the repair and maintenance of coal tipple equipment, and requested an examination by Dr. Rhett Jabour. The Department of Labor designated Daniels as the responsible coal mine operator liable for the payment of any black lung benefits which may be due under the Act. Daniels responded and denied liability, asserting that it was "an engi-

neering/design company with a fabricating shop for spare parts and construction of proprietary equipment" and "*not an operator of a mine* or other covered facility." J.A. 117.

In connection with his claim, Mitchell received the requested physical examination by Dr. Jabour, as well as x-rays, a CT scan of his chest, pulmonary function studies, and arterial blood gas studies. Dr. Jabour, who appears to have been provided with a twelve year history of coal mine work, diagnosed Mitchell with complicated pneumoconiosis. Several x-ray readings by other physicians confirmed the presence of radiological evidence consistent with pneumoconiosis.

On July 18, 1997, following an initial determination denying benefits, an informal conference was held at Mitchell's request before the district director. For reasons not apparent from the record, Daniels did not appear. However, the district director subsequently issued a Memorandum of Conference finding that "[a]ll parties agreed that Mr. Mitchell was a coal miner within the meaning of the Act and Regulations," "agreed to 12 years of employment as a coal miner," and "agreed that The Daniels Company meets all requirements for designation as responsible operator." J.A. 135. The district director also found that Mitchell had established the existence of pneumoconiosis and that, based upon the ten-year employment presumption contained in the regulations, the pneumoconiosis arose from coal mine employment. *See* 20 C.F.R. § 718.302 (2006) ("If a miner who is suffering or suffered from pneumoconiosis was employed for ten years or more in one or more coal mines, there shall be a rebuttable presumption that the pneumoconiosis arose out of such employment. (See § 718.203)."). However, benefits were denied because Mitchell had failed to establish total disability. *See* 20 C.F.R. § 718.204 (2006).

Pursuant to Mitchell's request, a hearing was held on October 7, 1998, before Administrative Law Judge ("ALJ") Stuart Levin. Daniels' personnel director and a shop foreman appeared at the hearing without legal representation. Although ALJ Levin initially questioned the propriety of holding the hearing without legal representation present for Daniels, he ultimately proceeded and allowed the Daniels employees to testify regarding Mitchell's employment history with Daniels and Mesa and the extent of Mitchell's actual exposure to coal dust during his employment.

On May 18, 1999, ALJ Levin awarded benefits to Mitchell. The ALJ found that "Daniels Company and Mesa Engineering were one and the same employer," and that Daniels had previously stipulated to its status as the responsible operator and to Mitchell's history of twelve years of coal mine employment. J.A. 251. The ALJ also found that Mitchell had established complicated pneumoconiosis by radiographic evidence, entitling him to an irrebuttable presumption of total disability due to pneumoconiosis. *See* 20 C.F.R. §§ 718.204(b)(1), 718.304 (2006).

Daniels obtained legal counsel and filed a petition for review with the Board, challenging the propriety of the hearing being conducted without its being specifically informed of the right to legal counsel, as well as the determination that it was the responsible operator and that Mitchell was entitled to benefits. On June 28, 2000, the Board rejected the attorney representation claim and affirmed the responsible operator designation because Daniels had not timely objected to the finding and, alternatively, because it was supported by substantial evidence. However, the Board vacated and remanded the award of benefits because the ALJ had failed to weigh conflicting medical evidence on the issue of complicated pneumoconiosis. On remand, ALJ Levin rejected Daniels' assertion that the medical reports failed to take into account Mitchell's history of tuberculosis and found that Mitchell had established complicated pneumoconiosis entitling him to benefits.

Daniels filed a petition for review, but shortly thereafter filed a petition for modification and moved to remand the claim to the district director for modification proceedings. *See* 20 C.F.R. § 725.310(a) (2006) (providing that "[u]pon his or her own initiative, or upon the request of any party on grounds of a change in conditions or because of a mistake in a determination of fact, the district director may, at any time before one year from the date of the last payment of benefits, or at any time before one year after the denial of a claim, reconsider the terms of an award or denial of benefits"). Consequently, the Board dismissed the petition for review subject to reinstatement, and remanded the matter to the district director.

In modification proceedings, Daniels submitted additional information regarding the structure of Daniels and its relationship to Mesa,

as well as more comprehensive records and testimony detailing Mitchell's work history at the tipples. Daniels also submitted medical reports from Drs. Zaldivar, Meyer, Fino, Branscomb, Wiot, and Spitz, who, by way of summary, collectively opined that Mitchell's pulmonary impairments were the result of his history of tuberculosis, sarcoidosis, and cigarette smoking, and could not be the result of coal workers' pneumoconiosis given his limited actual exposure to coal dust. The details of the medical opinions, as well as those submitted in support of Mitchell, are exhaustively discussed in the underlying decisions. For our purposes, it is sufficient to note that the parties agree that Mitchell's x-rays and CT scan show significant abnormalities in his lungs, including opacities greater than one centimeter, but disagree as to the cause of the abnormalities. Mitchell claims they are the result of complicated pneumoconiosis caused by coal dust exposure. Daniels asserts they are the result of sarcoidosis and tuberculosis, and that Mitchell's coal dust exposure was insufficient to have resulted in simple, much less complicated, coal workers' pneumoconiosis. The district director denied Daniels' request for modification without explanation.

A hearing was thereafter held before ALJ Linda Chapman. With regard to Daniels' challenge to its designation as the responsible operator, ALJ Chapman found that ALJ Levin's findings — that Mitchell had worked as a miner for Daniels for twelve years and that Daniels was properly designated the responsible operator — were "law of the case" and could not be challenged in modification proceedings. With regard to the entitlement claim, ALJ Chapman found no mistake of fact in ALJ Levin's determination that Mitchell had established complicated pneumoconiosis by the x-ray evidence. In her ruling, however, ALJ Chapman refused to consider the additional medical reports submitted by Daniels because she viewed them as having been based solely on the assumption that Mitchell "had *only* 670 hours of coal dust exposure, contrary to its earlier stipulation of 12 years, when in fact [Daniels] has not established that there were *no* significant periods of coal dust exposure, and thus has not rebutted the regulatory presumption that [Mitchell] was regularly and continuously exposed to coal dust during the course of his employment with [Daniels]." J.A. 694. Given the stipulated history of twelve years of regular and continuous coal dust exposure, ALJ Chapman found "that the new medical opinion evidence does not affirmatively show that the opacities on

[Mitchell's] x-ray are not there, or are not what they seem to be, that is, complicated pneumoconiosis." J.A. 694.

Daniels thereafter sought Board review of ALJ Chapman's decision, as well as reinstatement of its appeal of ALJ Levin's decision. The Board affirmed ALJ Levin's decision and denied the claim that ALJ Levin had erred in failing to notify Daniels of its right to counsel. With regard to ALJ Chapman's decision, the Board vacated the determination that ALJ Levin's findings could not be challenged under the "law of the case" doctrine and remanded for a determination of "whether the stipulations were fairly entered into" at the informal conference "and therefore binding upon the parties." J.A. 746. If so, the parties could be bound on modification by them. If not, the ALJ was directed to "render findings on whether [Daniels] meets the requirements of being named the responsible operator under the regulations and the length of [Mitchell's] coal mine employment." J.A. 746 (footnote omitted). With regard to ALJ Chapman's finding that Mitchell was entitled to benefits, the Board affirmed by a split decision.

On remand, ALJ Chapman found that Daniels had fairly entered into the stipulations and was bound by them. In the alternative, she found that "the record supports the original findings of Judge Levin" regarding those issues. J.A. 780.[4] On review, the Board reversed ALJ Chapman's finding that Daniels had fairly entered into the stipulations because Daniels was not present at the informal conference. *See Wellmore Coal Corp. v. Stiltner*, 81 F.3d 490, 497 (4th Cir. 1996) (noting that "the informal conference contemplated by the regulations cannot take place without all parties present. Nor can a valid or meaningful Memorandum of Conference be issued when the issues were

---

[4]ALJ Chapman also *sua sponte* considered and held "that the interests of justice have not been served by allowing [Daniels] to reopen these factual determinations by way of modification, and to attempt to make a better showing, after its own failure to preserve those issues in accordance with the procedural rules." J.A. 778. Nevertheless, she addressed the issue of the fairness of the stipulations as directed by the Board and, as noted by the Board, did not base her decision upon this initial determination regarding the propriety of allowing Daniels to reopen the issues in modification proceedings. Accordingly, we also decline to address the issue.

not discussed by the parties and the deputy commissioner"). However, the Board affirmed ALJ Chapman's alternative finding that the record sufficiently supported Daniels' designation as the responsible operator. With regard to the entitlement issue, the Board believed it unnecessary to address whether ALJ Chapman's finding that Mitchell had twelve years of coal mine employment was supported by substantial evidence because the ALJ's finding that Mitchell had complicated pneumoconiosis was not based upon a ten-year presumption of causation and, consequently, the award of benefits "[wa]s not tainted by findings regarding the years of coal mine employment." J.A. 861.

## II.

Daniels now seeks review of the Board's decisions, challenging its designation as the responsible operator, its determination that Mitchell is entitled to black lung benefits, and its rejection of the attorney representation challenge.

On a petition for review of an order of the Board affirming an ALJ's decision, "we undertake an independent review of the record, as in the place of the [Board]," *see Dehue Coal Co. v. Ballard*, 65 F.3d 1189, 1193 (4th Cir. 1995), to determine whether the decision "is in accordance with the law and supported by substantial evidence," *Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 217 (4th Cir. 2006). "In doing so, we confine our review to the grounds upon which the [Board] based its decision." *Id.* We review the Board's conclusions of law de novo. *See id.*

## III.

We begin with Daniels' challenge to its designation as the responsible coal mine operator liable for the payment of the black lung benefits awarded to Mitchell under the Act.

## A.

Under the Act, liability for the payment of black lung benefits is imposed upon the coal industry. For claimants who worked as coal miners on or after January 1, 1970, the Act places liability upon indi-

vidual "responsible operator[s]." *See Armco, Inc. v. Martin*, 277 F.3d 468, 473 (4th Cir. 2002); *see also* 30 U.S.C.A. § 932 (West 1986 & Supp. 2006); 20 C.F.R. § 725.490 (2000).

The "responsible operator" is "the operator which is determined liable for the payment of benefits" under the regulations. 20 C.F.R. § 725.492(a) (2000). It is the Director's burden to identify the responsible operator, *see* 20 C.F.R. § 725.412 (2000), and to develop evidence sufficient to support the conclusion that a potentially responsible operator is liable for benefits. *See Dir., OWCP v. Trace Fork Coal Co.*, 67 F.3d 503, 507 (4th Cir. 1995) (holding that the applicable regulations "give the Director, not [the designated responsible operator], the power to develop evidence on [the responsible operator] issue").[5]

"For the purposes of determining whether an employer is or was an operator or other employer covered by the Act which may be found liable for the payment of benefits," there is a "presumption that during the course of an individual's employment, such individual was regularly and continuously exposed to coal dust during the course of employment." 20 C.F.R. § 725.492(c) (2000). This presumption "may be rebutted by a showing that the employee was not exposed to coal dust for significant periods during such employment." *Id.* In addition to meeting other conditions specified in § 725.492,[6] which are not at issue here, the regulations also provide that "the operator or other employer with which the miner had the most recent periods of cumulative employment of not less than 1 year, *as determined in accordance with paragraph (b) [of section 725.493]* shall be the

---

[5]Under revisions to the regulations made effective to claims filed after January 19, 2001, the burden now falls upon the designated responsible operator to prove "[t]hat it is not the potentially liable operator that most recently employed the miner." 20 C.F.R. § 725.495(c)(2)(2006).

[6]"[T]he miner's disability or death must have arisen, at least in part, out of his employment with that operator; the operator must have operated a coal mine or other facility for any period after June 30, 1973; the miner must have worked for the operator for at least one day after December 31, 1969; and the operator must be capable of providing for the payment of benefits." *Armco, Inc. v. Martin*, 277 F.3d 468, 473 n.1 (4th Cir. 2002).

responsible operator." 20 C.F.R. §725.493(a)(1) (2000) (emphasis added). Section 725.493(b), in turn, provides as follows:

> From the evidence presented, the identity of the operator or other employer with which the miner had the most recent periods of cumulative employment of not less than 1 year and, to the extent the evidence permits, the beginning and ending dates of such periods, shall be ascertained. For purposes of this section, a year of employment means a period of 1 year, or partial periods totalling 1 year, during which the miner was regularly employed in or around a coal mine by the operator or other employer. Regular employment may be established on the basis of any evidence presented, including the testimony of a claimant or other witnesses, and shall not be contingent upon a finding of a specific number of days of employment within a given period. However, if an operator or other employer proves that the miner was not employed by it for a period of at least 125 working days, such operator or other employer shall be determined to have established that the miner was not regularly employed for a cumulative year by such operator or employer for the purposes of paragraph (a) of this section. A "working day" means any day or part of a day for which a miner received pay for work as a miner (see § 725.202(a)).

20 C.F.R. § 725.493(b) (2000) (emphasis added).[7] If the responsible coal mine operator is "[in]capable of assuming its liability for the payment of continuing benefits," 20 C.F.R. § 725.492(a)(4) (2000), and there is no "successor operator" liable for the payment of continuing benefits, 20 C.F.R. § 725.493(a)(2) (2000), the next most recent employer satisfying the definition of responsible operator will be considered the responsible operator, *see* 20 C.F.R. § 725.493(a)(4) (2000). "[I]f no responsible operator can be identified, benefits are

---

[7]Under § 725.202 of the regulations, the definition of a "miner" includes persons who work in coal mine construction and transportation. 20 C.F.R. § 725.202(a) (2006). Such workers are considered miners "to the extent [the] individual is or was exposed to coal mine dust as a result of employment in or around a coal mine or coal preparation facility." 20 C.F.R. § 725.202(b) (2006).

paid by the Black Lung Disability Trust Fund." 20 C.F.R. § 725.1(d) (2000).

In *Armco*, we interpreted the responsible operator provisions and held that they provide for a distinct "two-step inquiry for determining operator liability." *Armco*, 277 F.3d at 474. First, the "court must determine whether a miner worked for an operator for 'a period of one year, or partial periods totaling one year.'" *Id.* (quoting 20 C.F.R. § 725.493(b) (1999)). Second, the court must determine "whether a miner's employment during that one year was 'regular,' *i.e.* whether, *during the one year*, the miner 'was *regularly employed* in or around a coal mine.'" *Id.* (quoting 20 C.F.R. § 725.493(b)(1999)) (emphasis added). The determination of whether the miner was "regularly employed," in turn, is the subject of the remaining three sentences of Section 725.493(b).

> The next sentence explains that "*[r]egular employment* may be established on the basis of any evidence presented, including the testimony of a claimant or other witnesses, and shall not be contingent upon a finding of a specific number of days of employment within a given period." The sentence thereafter establishes that if this evidence reveals that "the miner was not employed by [the operator] for a period of at least 125 working days, such operator or other employer shall be determined to have established that the miner was not *regularly employed* for a cumulative year." Finally, for establishing the 125 day minimum for *regular employment*, the subsection defines a working day to be "[all] or part of a day for which a miner received pay." All three sentences thus define "regular employment" and do not undermine the threshold requirement of one year of employment.

*Id.* at 474 (quoting 20 C.F.R. § 725.493(b) (1999) (internal citations omitted). In summary, in order to establish that a particular operator is properly designated the "responsible operator" under § 725.493(b),

> it must be shown that (1) a miner worked for the coal mine operator for one year or partial periods totalling one year and (2) the miner worked regularly during that one-year period. To fulfill the requirement of working "regularly," the

subsection imposes a minimum of 125 working days. Thus, the regulations provide that responsible operator liability does not arise unless an operator employed a miner for one calendar year *during which* the miner regularly worked for that operator, defining "regularly worked" to be a minimum of 125 work days.

*Id.* at 474-75 (emphasis added).

## B.

In the proceedings below, ALJ Chapman found that Mitchell was exposed to coal dust when he worked at the coal tipples for Daniels, entitling him under § 725.492(c) to a presumption of regular and continuous exposure to coal dust during the course of his *entire* employment with Daniels. She rejected Daniels' attempt to rebut the presumption through its records of Mitchell's *actual* coal dust exposure because the "evidence supplied by [Daniels] indicated that [Mitchell] worked a minimum 670 hours at the tipples from 1979 to 1986" and contradicted "the Social Security earnings records [which] show that [Mitchell] began his employment in 1966, and ended in 1988." J.A. 781. Concluding that Daniels had failed to "establish that Claimant had no significant periods of coal dust exposure," ALJ Chapman ruled that Daniels had failed to "rebut[ ] the presumption set forth in 20 C.F.R. § 725.492(c)." J.A. 781.[8]

Having found that Mitchell was entitled to a presumption of twelve-plus years of regular and continuous coal dust exposure during his employment with Daniels under § 725.492, ALJ Chapman then turned to § 725.493 and concluded that Daniels had been properly designated the responsible operator because Mitchell had "worked at least one cumulative year as a coal miner for Mesa." J.A. 782. The ALJ arrived at this conclusion, however, by applying revised regula-

---

[8]Because the Board reversed ALJ Chapman's conclusion that the original stipulations found by Judge Levin — that Mitchell had twelve years of coal mine employment and that Daniels is the responsible operator — were fairly entered into and binding on Daniels, we need only review ALJ Chapman's alternative finding that the stipulations were supported by the record.

tion 20 C.F.R. § 725.101(a)(32)(iii) (2006) and finding, based upon Mitchell's employment by Mesa in 1966-67, 1975-78, and 1979-87, that Mitchell had "worked well over 200 days in or around the coal mines" for Mesa. J.A. 783. Because Mitchell "met the minimum 125 days requirement" of § 725.493, ALJ Chapman held, Daniels "ha[d] not established [Mitchell] was not regularly or continuously exposed to coal dust." J.A. 783.[9]

Daniels petitioned for review arguing, *inter alia*, that ALJ Chapman erred in applying revised regulation § 725.101(a)(32)(iii) to calculate Mitchell's working days for purposes of the responsible operator inquiry and erred in finding it to be the responsible operator under §§ 725.492 and .493 of the regulations.

C.

As correctly noted by Daniels, substantial revisions to the black lung regulations were promulgated in 2000 and became effective on January 19, 2001. With specified exceptions, including those provisions which govern the responsible operator inquiry, the revised regulations apply to all claims pending on that date. *See* 20 C.F.R. § 725.2(c) (2006). As a result, the revisions to the black lung regulations govern the issue of whether Mitchell is *entitled* to black lung benefits under the Act but *not* the issue of whether Daniels was properly designated the responsible operator liable for the payment of benefits under the Act. *See* 20 C.F.R. § 725.2 (2006) (noting that the revised regulations apply to the adjudication of claims pending on January 19, 2001, with the exception of, among others, the responsible coal mine operator provisions set forth in §§ 725.491, 725.492, 725.493, 725.494).

Under the *revised* regulations, "[a]n operator may be considered a 'potentially liable operator' with respect to a claim for benefits . . . if," among other things, "[t]he miner was employed by the operator

---

[9]ALJ Chapman also concluded, without explanation, that the "Social Security earnings records clearly establish that [Mitchell] has sufficient quarters of employment with Mesa to establish twelve years of coal mine employment." J.A. 783. The Board did not affirm this finding nor is it supported by substantial evidence.

. . . for a cumulative period of not less than one year" as defined in "§ 725.101(a)(32)." 20 C.F.R. § 725.494(c) (2006). Section 725.101(a), which provides general definitions for various terms used in the regulations, now includes a definition at subsection (a)(32) for a "year," as "a period of one *calendar* year (365 days, or 366 days if one of the days is February 29), or partial periods totaling one year, during which the miner worked in or around a coal mine or mines for at least 125 'working days.'" 20 C.F.R. § 725.101(a)(32).[10] Subsection (iii) of Section 725.101(a)(32), upon which ALJ Chapman relied, provides that:

> If the evidence is insufficient to establish the beginning and ending dates of the miner's coal mine employment, or the miner's employment lasted less than a calendar year, then the adjudication officer may use the following formula: divide the miner's yearly income from work as a miner by the coal mine industry's average daily earnings for that year, as reported by the Bureau of Labor Statistics (BLS). A copy of the BLS table shall be made a part of the record if the adjudication officer uses this method to establish the length of the miner's work history.

20 C.F.R. § 725.101(a)(32)(iii) (2006).[11]

---

[10]A "'working day' means any day or part of a day for which a miner received pay for work as a miner, but shall not include any day for which the miner received pay while on an approved absence, such as vacation or sick leave." 20 C.F.R. § 725.101(a)(32) (2006). However, "[i]n determining whether a miner worked for one year, any day for which the miner received pay while on an approved absence, such as vacation or sick leave, may be counted as part of the calendar year and as partial periods totaling one year." *Id.*

[11]According to the Judges' Benchbook of the Black Lung Benefits Act, the Bureau of Labor Statistics table referenced in § 725.101(a)(32) does not exist. The Department has adopted for use a table set forth as Exhibit 610 of the Office of Workers' Compensation Programs Coal Mine (BLBA) Procedure Manual instead. *See* http://oalj.dol.gov/PUBLIC/ BLACK_LUNG/REFERENCES/REFERENCE_WORKS/BEN06. HTM#_FTNREF4. For ease of reference, we continue to refer to it as the BLS table.

On review of the ALJ's determination, the Board acknowledged that § 725.101(a)(32)(iii) is inapplicable to the responsible operator inquiry, but nevertheless affirmed. Specifically, the Board held that use of the formula "as a guide" was permissible because § 725.493 provides no suggested method of calculation and the ALJ had the discretion to apply any reasonable method. The Board also rejected Daniels' assertion that remand was required due to the ALJ's failure to explain her calculation and provide a copy of the BLS average daily earnings table as required by § 725.101(a)(32)(iii), because Daniels, in the context of applying the same calculation to the *entitlement* issue, had calculated 217.23 working days with Mesa. The Board then affirmed the ALJ's finding that Daniels had failed to "prove that the miner was not employed by it for at least 125 working days pursuant to Section 725.493(b)," and the "related finding that, based on a finding of over 200 working days, employer did not rebut the presumption of Section 725.492(c) . . . (requiring proof that the miner 'was not exposed to coal dust for significant periods during such employment')." J.A. 863.

## D.

We hold that the ALJ had insufficient evidence to sustain the designation of Daniels as the responsible operator liable for the payment of black lung benefits to Mitchell under the Act and that the ALJ and Board erred as a matter of law in its application of the regulations governing the proper designation of the responsible operator.

Daniels, which is unionized under the United Steelworkers Union, does not operate a coal mine or coal tipple and does not perform coal mine or coal tipple work. It was designated the responsible operator under the Act by the director because Mitchell, in his original claim filed in January 1997, asserted that he worked for Daniels repairing and maintaining coal tipples from September 1974 to February 1988 (not 1966 to 1988 as found by the ALJ). The evidence, however, does not support even the former assertion, nor has Mitchell maintained as much in these proceedings. Mitchell was employed full-time by Daniels from September 1974 to February 1988, but not as a miner. Thus, standing alone, Daniels could not be designated a responsible operator under the Act because it is not engaged in coal mine or coal tipple work, nor did Mitchell technically perform any such work or receive

wages for it from Daniels. Mitchell did, however, work sporadically in the tipples from 1979 to 1986, while also employed by Daniels, on a part-time and as-needed basis repairing and maintaining equipment located at various tipple sites as an employee of Daniels' sister company, Mesa, which is unionized under and subject to the United Mine Workers Union.

Notwithstanding this undisputed evidence of a much more limited exposure to coal tipple work, the ALJ found that Mitchell was entitled to a presumption of regular and continuous exposure to coal dust during his entire tenure of employment with Daniels and that Daniels had failed to rebut that presumption. This determination was based upon the ALJ's finding that Mitchell's history of 670 hours of coal tipple employment covered only the years 1979 to 1986, and did not account for the fact that the Social Security records contained a work history from 1966 to 1988.

The ALJ's finding that Mitchell was employed by Daniels from 1966 to 1988 is clearly unsupported by the evidence in the record. Indeed, the evidence in this regard is uncontradicted. However, even if one attributes Mitchell's coal tipple work for Mesa to Daniels and concludes that he was entitled to the presumption of regular and continuous exposure to coal dust during his actual years of employment with Daniels (1974-1988), Daniels has rebutted the presumption of regular and continuous coal dust exposure during those years through the uncontradicted evidence that Mitchell's actual exposure was limited to the relatively small amount of time he was technically working for and paid by Mesa.

The director has likewise failed to demonstrate that Daniels meets the criteria for designation as the responsible operator under § 725.493. Although it is not entirely clear from the analysis, it appears that the ALJ found that Mitchell had "worked at least one cumulative year as a coal miner *for Mesa*" because he had worked for Mesa in or around the coal tipples "for a period of at least 125 working days." J.A. 782 (emphasis added). And, the ALJ also arrived at the finding of greater than 125 working days by applying § 725.101(a)(32)(iii) (2006). Hence, it appears that the ALJ may have viewed Daniels to be a responsible operator based upon the general

presumption of § 725.492, and viewed Mesa to be a responsible operator based upon the specific criteria of § 725.493.

In any event, an employer's liability as the responsible operator for payment of any award of black lung benefits to a miner does not arise unless the evidence establishes that the employer employed the miner for one calendar year *during which* the miner regularly worked in or around a coal mine (or tipple in this case), defining regularly worked to be a minimum of 125 working days. *See* 20 C.F.R. § 725.493 (2000); *Armco*, 277 F.3d at 474-75. A "'working day'" means any day or part of a day for which a miner received pay for work as a miner." 20 C.F.R. § 725.493 (2000). It is a distinctive two-step inquiry. *See Armco*, 277 F.3d at 474.

If we view Mitchell as an employee of only Mesa when he was working as a miner, the first step of the "responsible operator" inquiry is not met. The ALJ found that Mitchell "worked at least one cumulative year as a coal miner for Mesa," J.A. 782, based upon her finding, under the *revised* regulation, that Mitchell "worked well over 200 days in or around the coal mines," J.A. 783. This finding, however, conflates the two inquiries and relies upon an inapplicable regulation, rendering it erroneous as a matter of law. It is also unsupported by substantial evidence as no one claims that Mitchell worked for Mesa for a period of one year or partial periods totaling one year.

If we view Mitchell as an employee of Daniels and attribute his time in the coal tipples as a Mesa employee to Daniels, as apparently the Board did, then the evidence is sufficient to establish the first step of the inquiry. Mitchell was employed by Daniels for the minimum period of one year. The evidence is insufficient, however, to establish the second step of the inquiry — that Mitchell "was regularly employed in or around a coal mine by the operator or other employer" during his employment. 20 C.F.R. § 725.493(b) (2000).

The ALJ found that Mitchell worked "well over 200 days in or around the coal mines" based upon a purported calculation of working days under revised regulation 20 C.F.R. § 725.101(a)(32)(iii). The Board acknowledged that the revised regulation was inapplicable, but held that its use as a "guide" was permissible and affirmed the finding

that Mitchell had more than 125 working days for purposes of
§ 725.493. This was error.

First, even if it would be generally appropriate to use
§ 725.101(a)(32)(iii)'s formula as a "guide" to calculate "working
days" in cases which precede its effective date, it was not appropriate
to apply it as a guide in this case. By its terms, the regulation may be
used in situations where the miner's employment lasted less than one
year or "the beginning and ending dates of the miner's coal
mine employment" cannot be established. *See* 20 C.F.R.
§ 725.101(a)(32)(iii) (2006). Here, the record contains documentary
evidence of Mitchell's employment by Mesa, including "payroll reg-
isters listing the specific dates on which the miner was dispatched to
the coal mine tipples, his hours, and his pay." J.A. 867. The formula's
calculation is also to be based upon BLS average daily earnings for
the coal mine industry, and any calculation thereunder "shall" be
accompanied by a copy of the BLS table. Here, the ALJ did not attach
the table and did not explain her calculation. Nor does it appear that
she took into account the undisputed evidence that Mitchell, by virtue
of the character of his work for Mesa, was paid tipple wages at
inflated overtime rates. In short, § 725.101(a)(32)(iii) is not applicable
to the responsible operator inquiry in this case, nor would we affirm
its use as a "guide" given the multiple deficiencies present in its appli-
cation; its use as a "guide" in this case could not help but yield an
unreliable and unfair result.

Second, even if we thought the calculation to be appropriate and
representative of Mitchell's actual work days in the tipples, the find-
ing that Mitchell "worked well over 200 days in or around the coal
mines" (or 217 days as calculated by the Daniels in the entitlement
context) does not translate to a finding that Daniels has been properly
designated a responsible operator.[12] In order for Daniels to be liable

---

[12]Daniels does not dispute that it calculated 217 days under the regula-
tion's formula in the context of addressing the *entitlement* issue. How-
ever, this was done for the purpose of demonstrating that the finding of
twelve years of coal mine employment — which impacts the determina-
tion of whether Mitchell had coal miner's pneumoconiosis — would *also*
be unsupported by the calculation under the regulation. Daniels' calcula-
tion does not undermine the actual evidence of Mitchell's working days,

as the "responsible operator" under § 725.493(b), the director was required to show that Daniels employed Mitchell "for one calendar year *during which* the miner regularly worked for [Daniels], defining 'regularly worked' to be a minimum of 125 work days." *Armco*, 277 F.3d at 475 (emphasis added). However, because Mitchell worked approximately 200 days in coal tipples over the course of his *entire* fourteen-year career as a Daniels employee, the Board held that he was properly deemed to have worked regularly as a coal miner in coal mine employment. Under the view of the Board and director, "regular employment" under § 725.493(b) is established if an employee works a total of 125 days over the course of his entire period of employment, even if that employment lasts for a decade or more. So long as the employee worked a total of at least 125 days in or around a coal mine or tipple at *any* time during his employment, he will be deemed to have been "regularly employed in or around a coal mine." *Id.* at 474 (internal quotation marks omitted). We have not interpreted § 725.493 in such a manner nor, as we noted in *Armco*, do the intervening amendments to the regulations support such an interpretation:

> In 20 C.F.R. § 725.494(c)(2001), the Department of Labor states that an operator is a responsible operator only if the miner at issue "was employed by the operator . . . for a cumulative period of not less than one year." The section then references 20 C.F.R. § 725.101(a)(32) (2001), which defines a "year" as "a period of one calendar year (365 days, or 366 days if one of the days is February 29), or partial periods totaling one year, *during which* the miner worked in or around a coal mine or mines for at least 125 'working days.'" Although these later revisions do not bind our inter-

---

nor would any calculation under that regulation take into account that Mitchell's wages were substantially inflated because he was paid time-and-a-half, double-time, and sometimes triple-time wages because his work fell on holidays and weekends when the tipples were not in operation. Accordingly, the estimate produced by the formula would be expected to substantially exceed the actual days worked. In short, it is unfair to excuse the ALJ's improper use of the regulation simply because Daniels arrived at a similar figure when properly applying it on an unrelated issue.

pretation of the regulations as they stood at the time of the claim's resolution, they do inform our analysis of what the earlier, less clearly written regulations were intended to mean.

*Id.* at 475 (emphasis added).

To conclude, in order to designate Daniels as the responsible operator liable for the payment of any benefits due under the Act, it was incumbent upon the director to show that Daniels employed Mitchell "for one calendar year *during which* [Mitchell] regularly worked for [Daniels], defining 'regularly worked' to be a minimum of 125 work days." *Id.* at 475 (emphasis added). The director was not put to this task and substantial evidence does not support the determination. Accordingly, we grant Daniels' petition for review of the decision of the Benefits Review Board and reverse the Board's decision affirming Daniels' designation as the responsible operator under the Act.[13]

## IV.

We now turn to Daniels' challenge to the ALJ's determination that Mitchell is entitled to black lung benefits under the Act.

In order to establish an entitlement to black lung benefits, "a claimant must prove that (1) he has pneumoconiosis; (2) the pneumoconiosis arose out of his coal mine employment; (3) he has a totally disabling respiratory or pulmonary condition; and (4) pneumoconiosis is a contributing cause to his total respiratory disability." *See Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 529 (4th Cir. 1998); 20 C.F.R. §§ 718.201-.204 (2006).

With regard to the second element, § 718.203 of the regulation "sets forth two methods by which a claimant may establish that his pneumoconiosis arose at least in part out of his coal mine employ-

---

[13]Because we hold that Daniels was not properly designated to be the responsible operator, it is unnecessary for us to address Daniels' alternative argument that ALJ Levin erred in conducting the initial hearing in this case without specifically advising Daniels of its right to representation by legal counsel.

ment." *Napier v. Dir., OWCP*, 890 F.2d 669, 671 (4th Cir. 1989) (per curiam). "If a miner who is suffering or suffered from pneumoconiosis was employed for ten years or more in one or more coal mines, there shall be a rebuttable presumption that the pneumoconiosis arose out of such employment." 20 C.F.R. § 718.203(b) (2006); *see also* 20 C.F.R. § 718.302 (2006) (same). But "[i]f a miner who is suffering or suffered from pneumoconiosis was employed less than ten years in the nation's coal mines, it shall be determined that such pneumoconiosis arose out of that employment only if competent evidence establishes such a relationship." 20 C.F.R. § 718.203(c) (2006). The presumption "appl[ies] only if a miner worked in one or more coal mines for the number of years required to invoke the presumption," and "[t]he length of the miner's coal mine work history must be computed as provided by 20 C.F.R. § 725.101(a)(32)." 20 C.F.R. § 718.301 (2006).

With regard to the element of total disability, § 718.304 of the regulation provides for "an irrebuttable presumption" of total disability "due to pneumoconiosis if (A) an x-ray of the miner's lungs shows at least one opacity greater than one centimeter in diameter; (B) a biopsy reveals 'massive lesions' in the lungs; or (C) a diagnosis by other means reveals a result equivalent to (A) or (B)." *E. Associated Coal Corp. v. Dir., OWCP*, 220 F.3d 250, 255 (4th Cir. 2000) (footnote omitted); 20 C.F.R. § 718.304 (2006). "The condition described by these criteria is frequently referred to as 'complicated pneumoconiosis,' although that term does not appear in the statute." *E. Associated Coal*, 220 F.3d at 255.

In this case, Mitchell's x-rays and CT scan showed significant abnormalities in his lungs, including opacities greater than one centimeter in diameter, which could be consistent with pneumoconiosis and entitle him to the irrebuttable presumption of total disability. It is not enough, however, for the miner to prove that he has radiographic findings consistent with complicated pneumoconiosis and, thereby, that he is entitled to the irrebuttable presumption of total disability. The presumption of § 718.304 only establishes the third requisite element of proving total disability. The miner must also independently establish the second element — that his "pneumoconiosis arose at least in part out of coal mine employment." 20 C.F.R. § 718.203(a) (2006).

Early in these proceedings, the director found that the parties had stipulated to "12 years of employment as a coal miner" at the informal conference and that, *based upon the 10-year employment presumption contained in 20 C.F.R. § 718.302*, Mitchell had established that the pneumoconiosis arose from coal mine employment — stipulations that were upheld by ALJ Levin and ALJ Chapman. In modification proceedings, ALJ Chapman also refused to consider the expert opinions of Drs. Zaldivar, Wiot, Banscomb, Fino, Meyer, and Spitz, who concluded that the abnormalities were not the result of coal dust exposure because the 670 hours of exposure upon which their opinions were based was "contrary to [Daniels'] earlier stipulation of 12 years," J.A. 694, and did "not take into account the years 1966 to 1978, and 1987 and 1988, when [Mitchell's] social security earnings records reflect that he worked for [Daniels]." J.A. 693. Accordingly, ALJ Chapman ruled that "the new medical opinion evidence does not affirmatively show that the opacities on [Mitchell's] x-ray are not there, or are not what they seem to be, that is, complicated pneumoconiosis." J.A. 694.

Albeit through a tortured procedural history, the Board ultimately ruled that Daniels had not fairly entered into the stipulations at the informal conference and were not bound by them, but affirmed the ALJ's alternative finding that Mitchell was entitled to benefits because he had established the existence of complicated pneumoconiosis under 20 C.F.R. § 718.304 and because the new medical opinion evidence regarding causation did not refute that finding. The Board declined, however, to endorse the ALJ's finding that Mitchell had twelve years of coal mine employment:

> [R]eview of the administrative law judge's decision reveals that the stipulation form reflecting twelve years of coal mine employment had no bearing on her decision; she relied upon the evidence in the record to find that the abnormalities shown on x-ray were complicated pneumoconiosis arising out of coal mine employment. . . .

> [T]he determination that claimant established the existence of complicated pneumoconiosis arising out of coal mine employment was made without benefit or application of the ten year presumption at Section 718.203(b). Accordingly,

we need not address whether the administrative law judge on remand erred in finding that the record supported a finding of twelve years of coal mine employment. In sum, since both [ALJs] analyzed the evidence of record to find that claimant established the existence of complicated pneumoconiosis arising out of coal mine employment, the award of benefits is not tainted by findings regarding the years of coal mine employment.

J.A. 860-61. The dissenting judge disagreed. She would have remanded the case to the ALJ for proper calculation of the years of coal mine employment under § 725.101(a)(32) and reconsideration of the medical evidence in light of this finding. As noted by the dissenting judge:

In this case, the length of the miner's coal mine work history and the number of his working days are essentially the same, since the record documents that the miner's coal mine employment occurred when he was sent to coal mine tipples to install equipment manufactured by his employer, not during the bulk of his time that he spent working in his employer's fabrication shop building that equipment. The record contains payroll registers listing the specific dates on which the miner was dispatched to the coal mine tipples, his hours, and his pay. Thus, employer validly argues that the administrative law judge should have determined the length of the miner's coal mine employment by using the same formula from Section 725.101(a)(32) that she employed to calculate the miner's working days.

Using the formula in Section 725.101(a)(32)(iii), the administrative law judge determined that the miner worked "well over 200 days in or around the coal mines." Yet when she determined the length of the miner's coal mine employment [for purposes of the responsible operator inquiry], she merely referenced his Social Security earnings records to find twelve years of coal mine employment.

J.A. 866-67 (internal citations and footnote omitted).

On appeal, Mitchell acknowledges the ALJ's failure to compute Mitchell's coal mine work history under § 725.101(a)(32) for purposes of evaluating his entitlement to benefits under the Act, but he asserts that we should affirm because (1) causation was not based upon the ten year presumption found at 20 C.F.R. § 718.203; and (2) the entitlement to benefits determination was based upon § 718.304's irrebuttable presumption of total disability, which flows from the presence of opacities greater than one centimeter in diameter on the x-ray and not from the establishment of a certain minimum number of years of coal mine employment. We are unpersuaded.

First, it is clear that Mitchell was originally awarded benefits based upon the now-defunct stipulation of twelve years of coal mine employment. After that stipulation was found non-binding, the ALJ failed to properly calculate the number of work days, failed to evaluate the medical evidence in light of the limited history of coal dust exposure, and discredited numerous medical reports from competent physicians who relied on a history of much less than twelve years of coal mine employment in reaching their opinion that the x-ray opacities could not have resulted from coal dust exposure. To the extent she considered the causation element separately, she appears to have relied upon her determination that the record supported a finding that Mitchell had twelve years of coal mine employment, but that finding was not affirmed by the Board and is not supported by substantial evidence.[14]

---

[14]As noted above, the amendments to the regulations are applicable to the entitlement issue, but not the responsible operator issue. The ALJ purported to calculate Mitchell's coal mine work history under § 725.101(a)(32) for purposes of evaluating whether Daniels was properly designated the responsible operator, and determined that Mitchell worked "well in excess of 200 days," but did not reach a definite calculation, did not explain her calculation, and did not attach the required BLS document. The ALJ did *not* utilize § 725.101(a)(32) in evaluating Mitchell's coal employment history when determining that he was entitled to benefits. Had she done so, we must assume that she would have arrived at the same approximation of 200 days and would not have calculated Mitchell's coal mine work history anywhere close to the requisite ten years necessary to invoke the presumption of causation under § 718.302.

The Board's conclusion that the finding of twelve years of coal mine employment is irrelevant to the entitlement issue because the irrebuttable presumption of § 718.304 was applied and subsumed the causation element is also erroneous. Although true that the § 718.304 presumption of total disability is not dependent upon a finding of ten or more years of coal mine employment, it is only an irrebuttable presumption of total disability. To prove entitlement to benefits, the remaining elements must be satisfied. As noted by the dissenting judge,

> with less than ten years of coal mine employment, the miner would have had to prove that his complicated pneumoconiosis, if present, arose out of coal mine employment. *See* 20 C.F.R. § 718.203(b), (c) . . . . In reviewing the various administrative law judges' decisions over the course of the claim proceedings, I am not convinced that the miner was made to prove that his complicated pneumoconiosis arose out of coal mine employment.

J.A. 868. We agree. Because the ALJ erred in failing to calculate Mitchell's years of coal mine employment in accordance with the regulations and erred in failing to properly consider and weigh the medical evidence in light of an accurate history of coal dust exposure, we vacate the award of black lung benefits and remand for further proceedings in accordance with this opinion.

## V.

For the foregoing reasons, we grant Daniels' petition for review and reverse the decision and order finding Daniels to be the responsible coal mine operator liable for payment of black lung benefits to Mitchell under the Act. Because Daniels is entitled to be dismissed, further challenges to the award of black lung benefits now falls upon the director. Accordingly, we vacate the decision awarding black lung benefits and remand the remainder of this matter to the Board for a determination of the director's position on Mitchell's continued entitlement to benefits in the wake of our responsible operator ruling and, if necessary, a proper calculation of the length of Mitchell's coal mine employment and evaluation of the medical evidence in light of that finding.

*REVERSED IN PART,*
*VACATED IN PART,*
*AND REMANDED*